1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7
8
9
10
11
12
13
14
15
16
17
18
19

GLOBAL GRAPHIC RESOURCES LLC, *et al.*

Petitioners,

v.

TRIUNFO, INC., *formerly known as Catalina Graphic Films, Inc.*,

Respondent.

_____

GLOBAL GRAPHIC RESOURCES LLC, *et al.*

Counter Claimants,

v.

TRIUNFO, INC., *formerly known as Catalina Graphic Films, Inc.*,

Counter Defendant.

Case No. 2:19-cv-01164-RFB-EJY

**ORDER**

20
21
22
23
24
25
26
27
28

### I.     INTRODUCTION

Before the Court is Petitioners-Counter Claimants Global Graphic Resources LLC ("GGR") and Daryl K. Hanzal's (ECF No. 71) MOTION for Partial Summary Judgment.

For the foregoing reasons, the Court grants in part and denies in part the motion for partial summary judgment.

### II.     PROCEDURAL BACKGROUND

On June 14, 2021, Respondent Triunfo, Inc., formerly known as Catalina Graphic Films,

Inc., ("Catalina") filed an amended complaint against Petitioners. ECF No. 59. GGR and Hanzal filed an answer on June 28, 2021. ECF No. 60. On June 28, 2021, GGR and Hanzal filed Counterclaims against Catalina. ECF No. 62. Catalina filed an answer on July 2, 2021. ECF No. 63. Discovery was due by May 2, 2022, and dispositive motions were due June 1, 2022. See ECF No. 70.

On May 10, 2022, GGR and Hanzal filed the instant Motion for Partial Summary Judgment. ECF No. 71. Catalina filed a Response on May 31, 2022. ECF No. 73. GGR and Hanzal filed a Reply on June 13, 2022. ECF No. 75. The Court held a hearing regarding the instant on March 7, 2023. ECF No. 83.

This Order follows.

## III.   FACTUAL BACKGROUND

### a.  Undisputed Facts

The Court finds the following facts to be undisputed.

#### i.  Events Leading to the Agreements

Catalina manufactured pressure sensitive products primarily used for printed retail point of purchase advertising and promotion. Catalina had manufacturing facilities in Chicago, Illinois and Las Vegas, Nevada and sold and distributed its products nationwide through relationships with third-party companies and distributors. In 2016, Hanzal was president of Ritrama, Inc., a manufacturer based in the Midwest that designed and manufactured self-adhesive materials. In September 2016, Hanzal approached Catalina shareholders, Jeff Dworman and Alan Dworman ("Dwormans"), at an industry trade show to tell them he was planning to leave Ritrama to start a new company and was interested in continuing his business relationship with Catalina. Hanzal informed the Dwormans that he was subject to a one-year non-compete agreement with Ritrama, but that the new company he formed, GGR, would sell products unrelated to Ritrama's and Catalina's business to avoid the non-compete limitation. Hanzal and Catalina contemplated a continued relationship after the expiration of Hanzal's non-compete with Ritrama. Hanzal and / / /

Catalina discussed the idea that Catalina would move its Midwest facility from Chicago to Minneapolis, where Hanzal lived, and that Hanzal would be responsible for Midwest region sales.

During the negotiations of a potential agreement regarding these sales, Hanzal was aware that the Dwormans were engaged in discussions to sell Catalina to Nekoosa Coated Products, LLC ("Nekoosa"), a competitor. The parties executed a Sales Representative Agreement ("SRA") and a Consulting Agreement ("CA") (together, the "Agreements"), both with an effective date of November 1, 2017. On March 1, 2018, Catalina sold its assets to Nekoosa, but Nekoosa declined to assume the Agreements. Catalina was unable to provide products for GGR/Hanzal to sell, following the sale of Catalina's assets to Nekoosa. In December 2018, Catalina made its last payment to GGR under the CA. On December 11, 2018, Catalina notified GGR and Hanzal that the Agreements were terminated. In doing so, Catalina relied on paragraph 9.2 of Exhibit B to the SRA, claiming that GGR had not met the requisite Annual Sales Quota. The CA was consequently terminated pursuant to paragraph 5.3(c) of the CA.

### ii.   The Agreements

#### 1.   The Sales Representative Agreement

The SRA states in relevant part:

> "This Sales Representative Agreement (this "<u>Agreement</u>"), dated November 1, 2017 (the "<u>Effective Date</u>"), is by and between Catalina Coating & Plastics Inc. d/b/a Catalina Graphic Films, Inc., a Nevada corporation ("<u>Company</u>"), and Global Graphic Resources LLC, a Minnesota limited liability company ("<u>Representative</u>").
>
> 1.     <u>Appointment and Acceptance</u>. The Company hereby appoints Representative as its sales representative to promote the sale of and solicit orders for the Company's products and services in the Assigned Territory (as defined below), and Representative accepts the appointment and agrees to promote the sale of and solicit orders for the Company's products and services. The scope of the Company's products and services covered by this Agreement shall be the current line of products and services in existence on the Effective Date.
>
> . . .
>
> 3.     <u>Exclusive Rights</u>. Subject to the terms of this Agreement, during the Term (as defined in <u>Paragraph 5</u>) and in consideration for Representative's satisfaction of the annual Net Sales (as defined in <u>Paragraph 4</u>) quotas described on <u>Exhibit A</u> attached hereto (the

"Annual Net Sales Quotas"),[1] the Company shall not engage any other sales representative to promote and sell the Company's products and services in the Assigned Territory (the "Exclusive Rights").

4.      Compensation.

(a)      Subject to the terms in Section 3.2 of the Terms and Conditions (as defined below), Company shall pay Representative five percent (5%) (the "Commission Payment") of the Net Invoice Price (as defined in this Paragraph 4) of the Company's products shipped into or services provided in the Assigned Territory on monthly Net Sales in excess of Two Hundred Fifty Thousand Dollars ($250,000) (the "Sales Threshold"). The Commission Payment shall be paid on customer orders regardless of whether the orders are transmitted to the Company by Representative or received directly by the Company from the customer. . . .

. . .

5.      Term. The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue through December 31, 2022, unless terminated earlier by either party pursuant to the Terms and Conditions. The Term shall automatically extend for additional, consecutive one (l)-year periods unless either party gives the other written notice of its election to terminate at least One Hundred Eighty (180) days prior to the end of the Term or the applicable renewal term.

6.      Early Termination Payment. Notwithstanding the Term, upon One Hundred Eighty (180) days prior written notice to Representative, the Company may terminate this Agreement effective December 31, 2020 (an "Early Termination") in exchange for payment of the Early Termination Payment (as hereinafter defined). The "Early Termination Payment" means a one-time payment to Representative in an amount equal to the greater of the aggregate amount of Commission Payments paid to Representative in 2018, 2019, or 2020. The Early Termination Payment shall be paid in a lump sum on or before January 31, 2021.

7.      Terms and Conditions. This Agreement is subject to the additional covenants, general terms and conditions attached hereto as Exhibit B (the "Terms and Conditions").

ECF No. 73-4 at 3-4 (underline in original). Exhibit B, ECF No. 73-4 at 6-9, states in relevant part

**8.**      Ownership. Company shall own all right, title and interest in and to the Company's products.

---

[1] Under the SA, the annual net sales quotas were the following: January 1, 2018 to December 31, 2018 - $4,500,000, January 1, 2019 to December 31, 2019 - $6,000,000, January 1, 2020 to December 31, 2020 - $8,000,000, January 1, 2021 to December 31, 2021 - $9,600,000, and January 1, 2022 to December 31, 2022 - $11,000,000.

9. <u>Termination</u>.

**9.1** Either party may terminate the Agreement if the other party is in material breach of any of its obligations hereunder and has not cured the breach within thirty (30) days after written notice specifying the breach. . . .

**9.2** Company may terminate this Agreement and/or the Exclusive Rights upon notice to Representative in the event that Representative fails to satisfy at least ninety-three percent (93%) of the applicable quota for any Annual Net Sales Quota.

**9.3** Either party may terminate this Agreement for any reason or no reason prior to the end of the Term or any renewal term pursuant to Paragraph 5 of the Agreement. . . .

**9.5** During the period of time from the date any notice of termination is given until the effective date of termination, (a) both parties shall continue to fulfill their obligations under this Agreement, and (b) Company shall have the right to interview, evaluate, select and train a replacement sales representative for the Assigned Territory.

**9.6** Notwithstanding the terms set forth in Paragraph 5 of the Agreement, in the event of a Sale of the Company (as hereinafter defined), Representative shall continue to serve as the Company's sales representative pursuant to the terms in the Agreement for a period of at least six (6) months after the date of the closing of a Sale of the Company. After such six (6)-month period, Representative may terminate this Agreement for convenience upon ninety (90) days written notice to the Company. For purposes of this Agreement, "Sale of the Company" means (a) a sale, merger or other transaction or series of transactions, as the result of which those persons or entities who beneficially held 50% or more of the voting power of the Company as of the effective date of the transaction or series of transactions do not beneficially hold 50% or more of the voting power of the Company (or the surviving or resulting entity thereof) after giving effect to such transaction or series of transactions, or (b) the direct or indirect sale or transfer, in any single transaction or series of transactions, of all or substantially all of the assets of the Company.

10. <u>Effect of Termination</u>. If this Agreement is terminated (a) by Company pursuant to <u>Section 9.1</u> above, then Company shall have no further obligation to pay any Commission Payments to Representative after the termination date, provided that Representative shall remain responsible to Company for any charge-

- 5 -

backs or refunds required pursuant to <u>Section 3.2</u>, or (b) by Representative pursuant to <u>Section 9.1</u> above or by either party pursuant to Paragraph 5 on page 2 above, then Company shall continue to pay Representative, subject to the terms of this Agreement, Commission Payments on all orders for Company products or services calling for delivery into the Assigned Territory which orders are dated prior to the effective date of termination. . . .

. . .

13.   <u>Limitation of Liability: Disclaimer of Warranties</u>. Except for damages actually awarded to a third party, neither party shall be liable to the other party for any indirect, special, punitive, or consequential damages (including, without limitation, lost profits) arising out of or in connection with this Agreement or the breach of this Agreement. . . .

ECF No. 73-4 at 7-8 (bold in original).

## 2.   The Consulting Agreement

For its part, the CA provides the following.

This Consulting Agreement (this "<u>Agreement</u>") is made and entered into as of November 1, 2017 (the "<u>Effective Date</u>"), by and among Catalina Coating & Plastics Inc. d/b/a Catalina Graphic Films, Inc., a Nevada corporation (the "<u>Company</u>") and Global Graphic Resources LLC, a Minnesota limited liability company ("<u>Consultant</u>") for the services of Daryl K. Hanzal ("<u>Hanzal</u>"). This Agreement is being entered into concurrently with the Proprietary Information, Inventions Assignment and Anti-Corruption Agreement by and among the Company, Consultant and Hanzal of even date herewith (the "<u>PIIA</u>"), attached hereto as <u>Exhibit B</u>.

. . .

1.   <u>Engagement</u>.   The Company hereby engages Consultant to provide the Services (as defined in <u>Section 2</u> below). Consultant hereby accepts such engagement and shall cause Hanzal to provide all Services. Hanzal agrees to provide the Services to the Company pursuant to the terms in this Agreement.

2.   <u>Services</u>. For purposes of this Agreement, the term "<u>Services</u>" means the services described on <u>Exhibit A</u> attached hereto.[2] . . . Consultant shall cause Hanzal to devote his productive

---

[2] Exhibit A, ECF No. 73-3 at 9, provides: "The Company is engaging Consultant for the services of Hanzal to perform business development services for the Company and to advise the Company in connection with its operations within Minnesota, Iowa, North Dakota, South Dakota, Wisconsin, Illinois, Indiana, Michigan, and the greater St. Louis metropolitan statistical area, Sharpline Converting in Wichita, Kansas, and Adcraft Screen Printing & Digital Products in Sioux City, Nebraska (collectively, the '<u>Assigned Territory</u>')."

time, energies, resources and abilities, to the extent required pursuant to <u>Section 4</u>, to providing the Services pursuant to this Agreement. It is contemplated that all of the Services shall be performed personally by Hanzal unless otherwise agreed to by the Company in writing. . . .

3.   <u>Compensation and Expenses</u>. As the sole consideration for providing the Services, the Company shall pay Consultant Ten Thousand Four Hundred Dollars ($10,400) per month (the "<u>Consulting Fee</u>") during the Term (as defined in <u>Section 5</u>). The Consultant shall bill the Company for the Consulting Fee on a monthly basis. The Company shall pay the Consulting Fee set forth in the Consultant's invoice within fifteen (15) days after receipt of such invoice. All expenses incurred by Consultant or Hanzal in connection with providing the Services in the Assigned Territory (as defined in <u>Exhibit A</u>) shall be the sole responsibility of Consultant; provided, however, that the Company shall make a one-time payment to Consultant of $35,000 on or before November 15, 2017, to reimburse Consultant for start-up expenses incurred under this Agreement. . . .

. . .

5.   <u>Term and Termination</u>.
5.1   <u>Term</u>. The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue through December 31, 2022, unless terminated earlier by either party pursuant to the terms in this <u>Section 5</u>. The Term shall automatically extend for additional, consecutive one (1)-year periods unless either party gives the other written notice of its election to terminate at least One Hundred Eighty (180) days prior to the end of the Term or the applicable renewal term.

5.2   <u>With Cause</u>. Either party may terminate the Agreement if the other party is in material breach of any of its obligations hereunder and has not cured the breach within thirty (30) days after written notice specifying the breach. . . .

5.3   <u>Automatic Termination</u>. This Agreement shall terminate automatically, and without the giving of notice, in the event that: (a) Hanzal dies, (b) either party shall become insolvent, shall ask its creditors for a moratorium, shall be the subject of a bankruptcy, or shall suffer appointment of a temporary or permanent receiver, trustee, or custodian for all or a substantial part of its assets, or (c) that certain Sales Representative Agreement of even date herewith by and between the Company and Consultant terminates (the "<u>Rep Agreement</u>").

5.4     <u>Effect of Termination</u>. On the termination of this Agreement, the Company shall not be obligated to continue to make any payments to Consultant other than to pay for any Consulting Fees for Services provided prior to the termination, pursuant to the terms of this Agreement.

5.5     <u>Termination by Consultant</u>. Notwithstanding the terms set forth in Section <u>5.1</u>, in the event of a Sale of the Company (as hereinafter defined), Consultant and Hanzal shall continue to provide the Services for a period of at least six (6) months after the date of the closing of a Sale of the Company. After such six (6)-month period, Consultant may terminate this Agreement for convenience upon ninety (90) days written notice to the Company. For purposes of this Agreement, "Sale of the Company" means (a) a sale, merger or other transaction or series of transactions, as the result of which those persons or entities who beneficially held 50% or more of the voting power of the Company as of the effective date of the transaction or series of transactions do not beneficially hold 50% or more of the voting power of the Company (or the surviving or resulting entity thereof) after giving effect to such transaction or series of transactions, or (b) the direct or indirect sale or transfer, in any single transaction or series of transactions, of all or substantially all of the assets of the Company.

ECF No. 73-3 at 2-4 (underline in original). Finally, the Agreements are both integrated, ECF No. 73-3 at 7; ECF No. 73-4 at 9, and allow for assignment, ECF No. 73-3 at 6; ECF No. 73-4 at 9.

**b.  Disputed Facts**

The parties dispute the following facts regarding why, by who, and when the Agreements were terminated. Whether it was foreseeable that Nekoosa would not assume the Agreements because Nekoosa would be unable to appoint GGR as an exclusive distributor in the applicable territory pursuant to the Agreements. Whether paragraph 9.6 of the SRA required GGR to continue serving as Catalina, and not Nekoosa's, sales representative. Whether the Agreements, including paragraph 9.6 of the SRA, were intended to give GGR and Hanzal an option to terminate the Agreements should they not like working with the new buyer. Whether GGR and Hanzal refused to renegotiate new terms of the Agreements with Nekoosa. Finally, whether GGR and Hanzal were paid all sums due and owing through the termination pursuant to the Agreements.

/ / /

## IV.    DISCUSSION

For the foregoing reasons, the Court grants in part and denies in part GGR and Hanzal's motion for partial summary judgment on Catalina's causes of action.

### a.    Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

### b.    Analysis

#### i.    Breach of Contract (Second Cause of Action)

The Court grants summary judgment on Catalina's breach of contract claim in GGR and Hanzal's favor.

#### 1.    Catalina Breached the Contract

In Nevada, breach of contract is "a material failure of performance of a duty arising under or imposed by agreement." Bernard v. Rockhill Dev. Co., 734 P.2d 1238, 1240 (1987).  A breach of contract claim under Nevada law requires (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. Richardson v. Jones, 1 Nev. 405, 409 (Nev. 1865); Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013). Under Nevada law,

the objective of interpreting contracts is to discern the intent of the contracting parties. Am. First Fed. Credit Union v. Soro, 359 P.3d 105, 106 (Nev. 2015). "[W]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning and the contract must be enforced as written; the court may not admit any other evidence of the parties' intent because the contract expresses their intent." Ringle v. Bruton, 86 P.3d 1032, 1039 (Nev. 2004). "[W]hen a contract is ambiguous, it will be construed against the drafter," and "[i]f there is an ambiguity requiring extrinsic evidence to discern the parties' intent, summary judgment is improper." Dickenson v. State, Dep't of Wildlife, 877 P.2d 1059, 1061 (Nev. 1994).

GGR and Hanzal argue that Catalina, as the breaching party, cannot claim breach of contract. Catalina breached the SRA in three respects, based on the March 1, 2018 sale of its assets to Nekoosa. First, the sale resulted in Catalina denial of GGR's Exclusive Right to sell Catalina's products as there was none to sell anymore. Second, the sale also resulted in Nekoosa selling Catalina's products in GGR's Assigned Territory. Finally, the sale resulted in GGR's alleged breach, i.e., its failure to satisfy the Net Annual Sales Quota in 2018, was due to the sale of all of Catalina's assets that left GGR with no products to sell. Catalina, however, contends that it was GGR and Hanzal that breached the Agreements. This is because they refused to renegotiate the Agreements with Nekoosa, as they were required to continue to work with a successor of Catalina for up to six-months following the closing of a sale pursuant to the Agreements. Yet, despite Nekoosa's communications, GGR and Hanzal failed to perform in accordance with the explicit language of the Agreements. Accordingly, the contract could have been terminated thirty days after the March 23, 2018 notice. Instead, after nine months of non-performance by GGR and Hanzal and explicit representations, as early as March of 2018, that they no longer represented Catalina, Catalina properly terminated the Agreements pursuant to paragraph 9.2 of the SRA for GGR's failure to meet the requisite annual sales quota.

The Court finds that, even assuming the facts in the light favorable to Catalina, Catalina breached the Agreements as a matter of law by failing to provide GGR and Hanzal with products and services to sell. It is undisputed that the Agreements gave GGR and Hanzal the exclusive right to sell Catalina's products in the Assigned Territory, from November 2017 to December 31, 2022.

It is also undisputed that the Agreements explicitly contemplate any sale of Catalina and/or its assets.  As Paragraph 9.6 of the SRA states

> Notwithstanding the terms set forth in Paragraph 5 of the Agreement, in the event of a Sale of the Company (as hereinafter defined), Representative shall continue to serve as the Company's sales representative pursuant to the terms in the Agreement for a period of at least six (6) months after the date of the closing of a Sale of the Company, After such six (6)-month period, Representative may terminate this Agreement for convenience upon ninety (90) days written notice to the Company. For purposes of this Agreement, "Sale of the Company" means . . . or (b) the direct or indirect sale or transfer, in any single transaction or series of transactions, of all or substantially all of the assets of the Company." Paragraph 5.5 of the CA states: "Notwithstanding the terms set forth in Section 5.1, in the event of a Sale of the Company (as hereinafter defined), Consultant and Hanzal shall continue to provide the Services for a period of at least six (6) months after the date of the closing of a Sale of the Company. After such six (6)-month period, Consultant may terminate this Agreement for convenience upon ninety (90) days written notice to the Company. For purposes of this Agreement, "Sale of the Company" means . . . (b) the direct or indirect sale or transfer, in any single transaction or series of transactions, of all or substantially all of the assets of the Company.

The Court finds that the Agreements clearly presume that, for at least six months after any sale of Catalina, Catalina's products would still be available for GGR and Hanzal to sell in the Assigned Territory, regardless of who owned them. Yet, this was not the case as Nekoosa, Catalina's buyer, bought Catalina's assets and refused to assume the terms of the Agreements. Thus, Catalina's failure to ensure that its products were available for GGR and Hanzal constitute a material breach of the Agreements.

The Court cannot identify, nor does Catalina point to any provisions in the Agreements that required GGR and Hanzal to renegotiate the terms of the Agreements with any buyer of Catalina and its assets. The Agreements are valid, complete, and unambiguous.  Paragraph "10.1 Amendment" of the CA provides that "[a]ll amendments or modifications of this Agreement shall be in writing and shall be signed by each of the parties hereto." Yet, Catalina has not put forth any
/ / /

1    facts demonstrating that it, GGR, and Hanzal attempted to amend the Agreements pursuant to

2    these paragraphs so as to invoke a reasonable dispute over these provisions.

3                      **2.   Catalina's Affirmative Defenses Fail**

4           Finally, Catalina fails to show that its material breach would be entitled to either an

5    affirmative defense of frustration of purpose or impossibility of performance. Catalina contends

6    that it was a basic and foundational assumption of the parties that Nekoosa would assume the

7    Agreements. For Catalina, the principal purpose of the Agreements was to secure Hanzal's services

8    to sell their products and to have such services continue into the post-acquisition period for

9    Hanzal's benefit. A frustration of this purpose occurred, however, when Nekoosa refused to

10   assume the Agreements because Nekoosa determined that it would be unable to appoint GGR as

11   an exclusive distributor in the applicable territory pursuant to the Agreements. Further, because

12   Catalina sold its assets to Nekoosa, it was impossible for Catalina to perform under the

13   Agreements.

14          Nevada recognizes frustration of purpose as a valid defense to breach of contract claims.

15   In Graham v. Kim, the Nevada Supreme Court stated that "[t]he doctrine of commercial frustration

16   applies to discharge a party's contractual obligation when 'performance remains possible but the

17   expected value of performance to the party seeking to be excused has been destroyed by a

18   fortuitous event, which supervenes to cause an actual but not literal failure of consideration.'" 899

19   P.2d 1122, 1124 (Nev. 1995) (quoting Lloyd v. Murphy, 153 P.2d 47, 50 (Nev. 1944)). Unlike the

20   Restatement (Second) of Contracts § 265,[3] however, Nevada requires that the event giving rise to

21   frustration of purpose be unforeseeable. In Graham, the Supreme Court of Nevada declined to

22   apply the defense of frustration of purpose to a real estate transaction where the subject property

23   was destroyed in a fire, because the buyers' purchase of fire insurance demonstrated that they

24   foresaw the possibility of this occurrence. Id.

25   / / /

26

27          [3] According to the Restatement (Second) of Contracts § 265, frustration of purpose occurs when "after a
     contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event,
28   the non-occurrence of which was a basic assumption on which the contract was made." When such an event occurs,
     performance under the contract is excused "unless the language or circumstances [of the contract] indicate the
     contrary." Id.

Separately, under Nevada law, the defense of impossibility is available to a promisor where his performance is made impossible or highly impractical by the occurrence of unforeseen contingencies, but if the unforeseen contingency is one which the promisor should have foreseen, and for which he should have provided, this defense is unavailable to him. See Nebaco, Inc. v. Riverview Realty Co., 482 P.2d 305, 307 (Nev. 1971). Nevada law follows Restatement (Second) of Contracts § 261, in explaining that, "in order for a supervening event to discharge a duty . . . the non-occurrence of that event must have been a basic assumption on which both parties made the contract." Cashman Equip. Co. v. West Edna Assocs., 380 P.3d 844, 852 (Nev. 2016). Thus, foreseeability is a critical consideration under both defenses.

The Agreements contain provisions that contemplate the sale of Catalina, thus indicating that it was foreseeable that Catalina could be sold. The Agreements, however, do not explicitly contemplate what the parties would do if Catalina failed to secure products for GGR and Hanzal to market and sell because of a buyer's refusal to assume the Agreements. That said, Catalina concedes that it was aware before it sold its assets to Nekoosa that Nekoosa would not assume the Agreements, thus it was foreseeable, before Catalina was sold to Nekoosa, that Nekoosa would decline to assume the Agreements. E.g., ECF No. 73 at 16 ("Even throughout negotiations, the buyer never notified the Dwormans that it would not assume GGR and/or Hanzal's Agreements until right before closing." (emphasis added)).[4] Therefore, it was foreseeable that, as a result of Nekoosa's intention to decline to assume the Agreements, Nekoosa would decline to provide Catalina the products necessary to comply with the Agreements.

Therefore, the Court concludes that Catalina's breach of contract claims fails as a matter of law. Instead, the Court finds that it was Catalina that breached the Agreements by failing to make its products available for GGR and Hanzal to sell.

### 3.   Damages Owed to GGR and Hanzal

"Damages for total breach . . . awards the non-breaching party a monetary award sufficient to place that party in the position it expected to find itself had all parties honored the contract."

---

[4] According to the Dwormans, Hanzal was immediately informed about Nekoosa's intent to not assume the Agreements.

1   <u>Cain v. Price</u>, 415 P.3d 25, 30 (Nev. 2018). "As a general rule, a party cannot recover damages for

2   loss that he could have avoided by reasonable efforts." <u>Conner v. S. Nevada Paving, Inc.</u>, 741 P.2d

3   800, 801 (Nev. 1987). "[T]he burden is upon the party whose wrongful act caused the damages

4   complained of to prove anything in diminution of the damages, or in other words, that the damages

5   might have been lessened by reasonable diligence on the part of the aggrieved party." <u>Cobb v.

6   Osman</u>, 433 P.2d 259, 263 (Nev. 1967).

7          The parties dispute the amount of damages Catalina would owe GGR and Hanzal for its

8   breach of the Agreements. In total, GGR and Hanzal seek $967,902.69 for Catalina's breach. As

9   to the SRA, GGR argues that Catalina's breach has resulted in $718,302.69 in damages. This

10  amount, according GGR, is based on the commissions payable on the net annual sales quotas, as

11  provided in Exhibit A of the SRA, and paragraph 6 of the SRA, titled "Early Termination

12  Payment." According to GGR,

> [u]nder paragraph 4 of the SRA, once GGR exceeds a monthly sales threshold of $250,000 ($3 million annualized), it is entitled to payment of 5% of the Net Invoice Price. (Id. at p. 29.) Thus, based on Net Annual Sales Quotas of $4.5 million, $6 million, and $8 million for 2018, 2019, and 2020, respectively, GGR's SRA damages are calculated as follows:
>
> | 2018 Commissions = ($4,500,000 - $3,000,000) x 5% = $75,000 | |
> | 2019 Commissions = ($6,000,000 - $3,000,000) x 5% = | $150,000 |
> | 2020 Commissions = ($8,000,000 - $3,000,000) x 5% = | $250,000 |
> | **Subtotal** | **$475,000** |
> | | |
> | Less 2018 Catalina Commission Payments | ($6,697.31) |
> | Total SRA Commissions | $468,302.69 |
> | *Plus* Early Termination Payment per SRA Paragraph 6 | $250,000 |
> | | |
> | **Total Damages for Breach of SRA** | **<u>$718,302.69</u>** |

ECF No. 71 at 7-8. GGR separately contends that Catalina's breach of the CA has resulted in

$249,600 in damages to it and Hanzal. The CA obligated Catalina to pay GGR $10,400 a month

until at least December 31, 2020 – the earliest date that the SRA could be properly terminated.

Catalina made its last payment, prior to terminating the Agreements, under the CA in December

2018. Thus, GGR is owed monthly payments from January 2019 through December 31, 2020.

- 14 -

Catalina disputes that GGR and Hanzal are owed either amount in damages under the Agreements. First, GGR refused to mitigate its potential damages by failing to renegotiate the Agreements with Nekoosa after they learned that Nekoosa would not be assuming the Agreements. Second, if damages are owed, they should be limited to only one year based on Catalina's right to terminate the Agreements pursuant to paragraph 9.2 of the SRA. This paragraph allowed Catalina to terminate the SRA, if GGR failed to satisfy at least 93 percent of the applicable quota for the pertinent year's annual sales quota. GGR and Hanzal's performance between November 2017 and February 2018, the months prior to the March 2018, indicated that GGR and Hanzal were not going to meet the sales quota for that year.

The Court concludes that genuine issues of fact exist to the amount of damages owed to GGR and Hanzal for Catalina's breach of the agreements. The Court first rejects Catalina's argument that GGR and Hanzal's failure to renegotiate the terms of the Agreements in and of itself constitutes a failure to mitigate damages. For the reasons stated above, GGR and Hanzal had no contractual duty to renegotiate the terms of the Agreements, and they also had no duty to help mitigate Catalina's breaching conduct. See Conner, 741 P.2d at 801 ("The rule of mitigation of damages begins when the breach is discovered."). The Court also rejects Catalina's contention that damages should be limited up to only one year based on Catalina's right to terminate the Agreements pursuant to paragraph 9.2 of the SRA. Even assuming the facts in Catalina's favor, the Court concludes that a reasonable jury could not find that GGR's alleged failure to satisfy at least 93% of the applicable sales quota is solely attributable to any alleged conduct by GGR that led to the lack of sales. It is undisputed that by March 2018, Catalina no longer had any products for GGR and Hanzal to sell, therefore it is reasonable to assume that that had an impact on the GGR and Hanzal's ability to meet the sales quota. The Court therefore agrees with GGR and Hanzal that damages under the SRA should be calculated based on the commissions payable on the net annual sales quotas and the "Early Termination Payment" paragraph of the SRA. The Court also agrees that damages under the CA should be calculated based on the monthly payment owed from January 2019 through December 31, 2020.

/ / /

That said, the Court finds that, assuming the facts in Catalina's favor, there are factual issues that go to the issue of damages. First, as to the commission calculation, GGR and Hanzal's sales were not on track to meet the net annual quota for 2018. Second, there is a genuine issue of fact as to whether GGR and Hanzal failed to mitigate their damages <u>after</u> they were informed of Nekoosa's intent to not assume the Agreements. According to the Dwormans, Hanzal refused to entertain Nekoosa's offers, failed to answer Nekoosa's important questions, and failed to negotiate at all with Nekoosa. GGR and Hanzal dispute these facts. It is, however, improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage.

The Court therefore grants GGR and Hanzal summary judgment on this claim, and the issue regarding the amount of damages owed to them for Catalina's breach shall proceed to trial.

### ii.  Breach of Implied Covenant of Good Faith and Fair Dealing (Third Cause of Action)

The Court grants GGR and Hanzal summary judgment on this claim.

As a preliminary matter, Catalina contends that this claim is not based on <u>tortious</u> breach but on a <u>contractual</u> breach. <u>See</u> <u>Hilton Hotels Corp. v. Butch Lewis Prods.</u>, Inc., 808 P.2d 919, 922–23 (Nev. 1991) (explaining the difference between the two claims). GGR and Hanzal's Reply does not dispute this contention; therefore, the Court applies the law for contractual breach to this claim.

"A contractual breach of the implied covenants of good faith and fair dealing occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." <u>Shaw v. CitiMortgage, Inc.</u>, 201 F. Supp. 3d 1222, 1252 (D. Nev. 2016) (quoting <u>Hilton Hotels Corp.</u>, 808 P.2d at 923-24). "Establishing such a breach of the implied covenant depends upon the nature and purposes of the underlying contract and the legitimate expectations of the parties arising from the contract." <u>Id.</u> "As such, a breach of the implied covenants of good faith and fair dealing is 'limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.'" <u>Id.</u> (quoting <u>McKnight v. Torres</u>, 563 F.3d 890, 893 (9th Cir.

2009)). "It neither alter[s] [] specific obligations set forth in the contract nor add[s] duties independent of the contractual relationship." <u>McKnight</u>, 563 F.3d at 893. Separately, "[i]t is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim." <u>Id.</u>

At bottom, Catalina's claim is that GGR and Hanzal's failure to renegotiate the Agreements with Nekoosa, after Nekoosa bought Catalina's assets, constituted a breach of the implied covenants of good faith and fair dealing. The Court disagrees. Nothing in the Agreements required that GGR and Hanzal renegotiate any of the Agreements' terms with Nekoosa. As such, the Court finds that Catalina's claim goes beyond GGR and Hanzal's alleged failure to comply with the express terms of the Agreements and is based on the creation of obligations not contemplated by the Agreements. <u>See</u> <u>Shaw</u>, 201 F. Supp. 3d at 1252. Because Catalina fails to show where in the Agreements GGR and Hanzal were required to renegotiate the terms of the Agreements, this claim fails. Separately, this claim also fails because GGR and Hanzal's alleged conduct is "based on the same conduct establishing a separately pled breach of contract claim." <u>McKnight</u>, 563 F.3d at 893.

Thus, the Court grants GGR and Hanzal summary judgment on this claim.

### iii.   Unjust Enrichment (Fourth Cause of Action)

The Court grants GGR and Hanzal summary judgment as to this claim.

Unjust enrichment is a theory of restitution in which a plaintiff confers a benefit and seeks payment of "as much as he . . . deserve[s]" for that benefit. <u>Certified Fire Prot. Inc. v. Precision Constr.</u>, 283 P.3d 250, 257 (Nev. 2012) (alteration in original). "Unjust enrichment has three elements: [(1)] the plaintiff confers a benefit on the defendant, [(2)] the defendant appreciates such benefit, and [(3)] there is acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." <u>Nautilus Ins. Co. v. Access Med., LLC</u>, 482 P.3d 683, 688 (Nev. 2021). "An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." <u>Leasepartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975</u>, 942 P.2d 182, 187 (Nev. 1997).

/ / /

Catalina contends that its unjust enrichment claim should not be dismissed. This is because the terms of the Agreements do not provide for a situation in which Defendants completely fail to perform, especially under the circumstances where the new buyer, to no party's knowledge, would not assume the Agreements with the acquisition of Catalina. Further, Hanzal, while under a contractual non-compete and while still being paid by Catalina, entered into business with a direct competitor of Catalina. Accordingly, despite Defendants not taking any steps to perform since March 2018, including negotiating with the new buyer to continue to sell Catalina's products, Catalina continued to pay Defendants the Consulting Fee through December 2018.[5] The Consulting Fee was to be paid "[a]s the sole consideration for providing the Services," and the Agreements did not consider ceasing payment for failed performance. Accordingly, because the Agreements did not provide for this situation, Catalina's claim for unjust enrichment can stand.

GGR and Hanzal disagrees, arguing that Catalina's unjust enrichment claim fails because there is a full and adequate remedy at law available to Catalina pursuant to the Agreements. Catalina ignores that the sale of its assets, and nothing else, prevented GGR's performance under the Agreements. Similarly, GGR cannot be charged with Catalina's failure to address the consequences of an asset sale in the event Nekoosa refused to assume the Agreements. Finally, Catalina's reference to GGR's alleged violation of a "contractual non-compete compete while still being paid by Catalina" only highlights the contractual relationship between the parties and why the unjust enrichment claim must be dismissed.

The Court finds that Catalina's unjust enrichment claim fails as a matter of law. First, the Agreements explicitly account for a situation where Defendants fail to comply with any of its obligations under the Agreements, including failing to market or sell products and any alleged violation of the non-compete agreement. See Leasepartners, 942 P.2d at 187. Second, to the extent that this claim is based on Catalina continuing to pay Hanzal pursuant to the CA until December 2018, it should also fail. This is because Catalina was paying Hanzal pursuant to the Agreements, which it concedes it did not terminate until December 2018, because of GGR and Hanzal's alleged

---

[5] Catalina has provided testimony that it was advised by its counsel "and out of abundance of caution" to continue to pay Hanzal "sums through December of 2018 when Catalina effectively terminated the Agreements."

failure to meet the sails quota. Presumably, if Hanzal had not breached the Agreements first and GGR and Hanzal were not not performing, Catalina could have been able to recover damages pursuant to the Agreements. Yet, as the Court concluded above concerning Catalina's breach of contract claim, Catalina was the one breached the Agreements first, not GGR and Hanzal.[6] Ultimately, Catalina fails to show that this claim seeks an equitable return of value beyond the terms of the Agreements.

Accordingly, summary judgment is granted on this claim as a matter of law.

### iv.   Negligent Misrepresentation (Fifth Cause of Action)

The Court denies GGR summary judgment on this claim.

Under Nevada law, to assert a claim of negligent misrepresentation, a plaintiff must establish that Defendants "in the course of [their] business, profession or employment, or in any other action in which [they] have a pecuniary interest, supplie[d] false information for the guidance of others in their business transactions" and caused pecuniary loss by the plaintiff's "justifiable reliance upon the information," if Defendants "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1387 (Nev. 1998).

Defendants assert that this claim fails because it does not identify any alleged misrepresentation of fact upon which Catalina relied. Catalina also fails to establish reliance because each of these alleged "misrepresentations" involve something that occurred after Catalina and GGR entered into the Agreements. Nekoosa's unwillingness to assume the Agreements has nothing to do with anything GGR or Hanzal said or did before the parties entered the Agreements. Similarly, Hanzal's "expressed desire to continue his relationship with" Catalina after being told that Catalina was exploring a sale transaction was demonstrably true because GGR entered into the Agreements with Catalina despite being informed of a potential sale of Catalina. Additionally,

---

[6] While not raised by GGR and Hanzal and not relied on by the Court to resolve this claim, the Court notes that Nevada recognizes the affirmative defense of voluntary payment to a claim of unjust enrichment. See Nevada Ass'n Servs., Inc. v. Eighth Jud. Dist. Ct., 338 P.3d 1250, 1254 (Nev. 2014). This "is an affirmative defense that provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment. The voluntary in the voluntary payment doctrine does not entail the mere payment of the bill or fee. Instead, it considers the willingness of a person to pay a bill without protest as to its correctness or legality." Id. at 1253 (internal quotation marks and citations omitted).

1   GGR and Hanzal's communications with the buyer of Catalina's assets is irrelevant because those
2   communications occurred after GGR, and Catalina executed the Agreements.

3       Catalina contends that it relied on GGR and Hanzal's representations that: (1) they wished
4   to continue their relationship with Catalina despite a potential asset sale and (2) GGR and Hanzal
5   would continue in good faith to perform their contractual duties despite such sale. GGR and Hanzal
6   did neither, including by failing to renegotiate the Agreement with Nekoosa.

7       Assuming the facts in Catalina's favor, the Court finds that there are material facts in
8   dispute that should go before a jury regarding this claim. The amended complaint alleges that GGR
9   and Hanzal (1) knew about the possible acquisition of Catalina's assets prior to entering into the
10  applicable Agreements; and (2) Hanzal expressed a desire to continue his relationship with
11  Catalina despite the possible acquisition. According to the Dwormans, Hanzal advised that the
12  Agreements were not to affect or be construed against Catalina and were only to give him an option
13  to terminate the Agreements should he not like working with the new buyer. The Dwormans thus
14  sought to ensure that the contract language gave Hanzal the opportunity to terminate the
15  Agreements after a six-month commitment to the new buyer. In entering the Agreements, Catalina
16  detrimentally relied upon GGR and Hanzal's representations that they wished to continue their
17  relationship with Catalina despite a potential asset sale and that GGR and Hanzal would continue
18  in good faith to perform their contractual duties despite such sale. Instead, GGR and Hanzal failed
19  to negotiate or entertain offers posed by the Nekoosa, instead, seeking additional compensation
20  under the Agreements in which they failed to render services in return. Moreover, Hanzal refused
21  to entertain Nekoosa's offers, failed to answer Nekoosa's important questions, and failed to
22  negotiate at all with Nekoosa. GGR and Hanzal dispute these facts. As the Court noted above, it
23  is improper for it to resolve genuine factual disputes or make credibility determinations at the
24  summary judgment stage.

25      Thus, the Courts denies GGR and Hanzal summary judgment on this claim, and it shall
26  proceed to trial.

27                          **v.  Declaratory Relief (First Cause of Action)**

28      Finally, the Court grants GGR and Hanzal summary judgment on this claim.

GGR and Hanzal contend that this declaratory relief claim must fail because a request for declaratory judgment cannot be maintained as a separate substantive claim. The Court finds that this contention lacks merit, as the Court has previously rejected similar arguments. See, e.g., Bank of New York Mellon v. Foothills at S. Highlands Homeowners Ass'n, No. 17-CV-01918, 2019 WL 1440254, at *3 (D. Nev. Mar. 30, 2019) (finding that the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, did not prohibit asserting declaratory relief as a stand-alone claim, and that the Ninth Circuit has only concluded that the Act did not create an independent basis for jurisdiction). There is no dispute that the Court has diversity jurisdiction to hear this case. The Court therefore proceeds to address this claim on the merits.

As Nevada substantive law applies, the Court employs the elements for this claim pursuant Nevada's Uniform Declaratory Judgment Act. Accordingly, "[t]o obtain declaratory relief, a plaintiff must establish four elements: (1) the existence of a justiciable controversy, such that a claim of right is asserted against one who has an interest in contesting the claim; (2) the parties have adverse interests; (3) the party seeking relief has a legally protectable interest in the controversy; and (4) ripeness of the controversy." MB Am., Inc. v. Alaska Pac. Leasing Co., 367 P.3d 1286, 1291 (Nev. 2016).

In turn, Defendants argue that, even if there is a standalone claim, Catalina's claim fails because both frustration of purpose and impossibility of performance defenses require that the event or condition relied upon to excuse performance be unforeseeable. They assert that Catalina's inability to perform was caused by its own voluntary sale of its assets to Nekoosa. For the reasons state in the above in the Court analysis regarding Catalina's affirmative defenses to breaching the Agreements, it finds that this claim fails.

Therefore, the Court grants summary judgment as to this claim.

## V.    CONCLUSION

**IT IS THEREFORE ORDERED** that Petitioners-Counter Claimants Global Graphic Resources LLC and Daryl K. Hanzal's (ECF No. 71) MOTION for Partial Summary Judgment is GRANTED in part and DENIED in part. The Court dismisses Respondent-Counter Defendant's

Triunfo, Inc. claims for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. The question of damages related to Catalina's breach of the Agreements and Respondent-Counter Defendant's Triunfo, Inc.'s negligent representation claim shall proceed to trial.

**IT IS FURTHER ORDERED** that the Parties have thirty days from the date of this order to file a Proposed Joint Pretrial Order.

**DATED:** <u>March 31, 2023</u>.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**